**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TRANSMONTAIGNE PRODUCT SERVICES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 09-0023-CG-M** |
| | ) | |
| **M/V WILBUR R. CLARK, and the Barge 7001, in rem and HANNAH MARINE CORPORATION, in personam,** | ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

On January 14, 2009, TransMontaigne Product Services, Inc. ("TransMontaigne") filed a verified complaint in this court seeking the arrest of the vessels M/V WILBUR R. CLARK and Barge HANNAH-7701 (the "Vessels") and asserting a maritime lien for fuel, oil, and supplies furnished to the defendant Hannah Maritime Corporation ("HMC") for use on or by the Vessels.[1] (Doc. 1).  On January 15, 2009, the United States Marshal's Service for the Southern District of Alabama arrested the Vessels in Mobile, Alabama.  (Docs. 7 & 8).  On January 23, 2009, Harrison Brothers Dry Dock & Repair Yard, Inc. ("Harrison Brothers") and Whistler Machine Works, Inc. ("Whistler") each filed a complaint in intervention against the Vessels seeking to enforce liens for repairs.[2]  (Docs. 9 & 10).  On February 27, 2009, Seabulk Towing Services, Inc.

---

[1] On February 5, 2009, TransMontaigne filed an amended verified complaint to increase the amount of its maritime lien claim and to correctly identify the barge as HANNAH-7701. (Doc. 27).

[2] On February 13, 2009, Harrison Brothers and Whistler each filed an amended verified complaint in intervention to correctly identify the barge.  (Docs. 37 & 38).

("Seabulk Services") and Seabulk Towing, Inc. ("Seabulk Towing") filed a verified complaint in

intervention to enforce liens for towing and related services.  (Doc. 53).  On March 12, 2009,

HMC filed a verified claim as owner to the Vessels.  (Doc. 61).   On April 20, 2009, Century

Services LP ("Century") filed a verified complaint in intervention asserting a preferred mortgage

lien against the Vessels.  (Doc. 73).  On April 24, 2009, DSI, LLC ("DSI") filed a verified

complaint in intervention asserting a maritime lien arising from the furnishing of necessaries to

the Vessels.  (Doc. 82).  This matter is before the court on Century's motion for partial summary

judgment and accompanying brief (Docs. 212 & 213), Whistler, Harrison Brothers, Seabulk

Services, Seabulk Towing and TransMontaigne's (hereinafter referred to as "the respondents")

response (Docs. 220 & 222), and Century's reply.  (Doc. 228).  For the reasons stated below, the

court finds that Century's motion for partial summary judgment is due to be granted.

## FACTS

HMC is a corporation formed under the laws of the State of Illinois and, at all times

material hereto, owned the Vessels.  (Docs. 1 & 120, Exs. 1 & 3).  On May 5, 2006, HMC

executed a loan agreement (the "Original Loan Agreement") in favor of National City Bank

(f.k.a. National City Bank of the Midwest)(hereinafter referred to as "NCB").  (Doc. 120-5).

Under the terms of the Original Loan Agreement, NCB agreed to make available a revolving

credit loan to HMC in the aggregate amount of $1,500,000.00 and a term loan in the original

principal amount of $9,250,000.00.  (Id., p. 5).  The Original Loan Agreement was thereafter

amended several times, the last of which was on April 2, 2008.  ("Amended Loan Agreement").

(Docs. 120-6, 120-7, 120-8, 120-9, 120-10).  HMC also executed and delivered five promissory

notes ("Notes") to NCB between November 2006 and April 2008.  In sum, under the terms of the

2

Notes, HMC agreed to repay a principal amount of $21,614,583.33 plus interest.[3]  (See Docs. 120-13, 120-14, 120-15, 120-16, 120-17).

As security for the Amended Loan Agreement and the Notes, HMC provided NCB a "First Preferred Fleet Mortgage." (Doc. 120-20).  This document was recorded with the United States Coast Guard's National Vessel Documentation Center ("NVDC") on May 9, 2006.  (Id., p. 1).  The original "Preferred Fleet Mortgage" document was thereafter amended and supplemented several times and each amendment and/or supplement was recorded with the NVDC.  Each document recites that it amends and/or supplements the "First Preferred Fleet Mortgage" document and all amendments and/or supplements thereto.  The "First Preferred Fleet Mortgage" and amendments apply to, and include the whole of, multiple documented vessels, including the Vessels, in full, jointly and severally, as to each of them.[4] (See Docs. 120-21, 120-

_____

[3] The first promissory note, which was executed  on November 3, 2006, was for a principal sum of $10,164,583.33. (Doc. 120-13).  The second promissory note, which was executed on May 21, 2007, was for a principal sum of $1,500,000.00.  (Doc. 120-14).  The third promissory note, which was executed on November 3, 2007, was for a principal sum of $3,750,000.00.  (Doc. 120-15).  The fourth promissory note, which was executed in August 2007, was for a principal value of $4,400,000.00.  (Doc. 120-16).  The fifth promissory note, which was executed on April 2, 2008, was for a principal value of 1,800,000.00. (Doc. 120-17).

[4] The original "Preferred Fleet Mortgage" document, dated May 9, 2006, provides the following collateral: Kristin Lee Hannah; HMC-501; HMC-502; HMC-503; HMC-504; HMC-509; HMC-510; HMC-512; HMC-513; Daryl C. Hannah; Hannah 1801; Hannah 1802; Hannah 2902; Hannah 2903; Peggy D. Hannah; Hannah D. Hannah; James A. Hannah; Donald C. Hannah; Hannah-6301; Hannah-7701; and Hannah-3601. (Doc. 120-20, p. 23).  The First Amendment, which was dated July 29, 2006, created a revolving credit facility and changed the payment terms but did not add any new collateral. (See Doc. 120-21, pp. 1 & 7).  The Second Amendment, which was dated November 3, 2006, again changed the payment terms and lowered some principal but did not add more collateral.  (Doc. 120-22, p. 1).  The Third Amendment, which was dated August 31, 2007, added one more vessel as collateral: the Rio Bravo.  (Doc. 120-23, p. 10).  A supplement dated September 13, 2007, also added one more vessel as collateral: the Pacific Victory.  (Doc. 120-24, p. 25).  A Fourth Amendment, dated April 2, 2008, provided a multiple advance term loan but did not add any collateral to the "Preferred Fleet

22, 120-23, 120-24, 120-25, 120-26).

NCB also received several other forms of security: (1) an assignment of HMC's insurances on the vessels, including any returns of premiums and proceeds (Doc. 220-7); (2) an assignment of all charters and earnings of various HMC vessels (Doc. 220-8); and (3) an assignment of the partnership interest of Donald C. Hannah.  (Doc. 220-9).

On September 22, 2008, NCB and HMC, who was in default of the Amended Loan Agreement at the time, entered into a forbearance agreement where HMC and several guarantors[5] provided consideration for NCB to forebear from taking any action against them or the collateral until December 31, 2008.  (Doc. 220-5, p. 1-2, 11).  The forbearance agreement specifically pointed to two defaults in December 2007:

> 1. Borrower's failure to provide within 120 days after the end of the fiscal year entered December 31, 2007 (I) the fiscal year end financial statements, (ii) the accountant certification and (iii) the accountant computation of compliance with financial covenants...
>
> 5. Borrower's, Parent's and/or their Affiliates' payment of salary, bonus and other compensation to Donald C. Hannah during fiscal year ending December 31, 2007 in the aggregate amount of $837.228.23 in violation of the $500,000 limitation...
> (Doc. 220-5, pp. 22-23).

The forbearance agreement also listed several other defaults that occurred in the nine months

---

Mortgage." (Doc. 120-25, p. 3 & 8).  Lastly, a supplement and fifth amendment dated September 22, 2008, provided a final list of collateral: Kristen Lee Hannah; HMC-502; HMC-503; HMC-504; HMC-510; Daryl C. Hannah; Hannah 1801; Hannah 1802; Hannah 2902; Peggy D. Hannah; Hannah D. Hannah; James A. Hannah; Hannah-6301; Hannah-7701; Rio Bravo; Pacific Victory; David E.; Hannah 2901; Hannah-3601; and Donald C. Hannah.  (Doc. 120-26, p. 8).

[5] The following entities are guarantors: Donald C. Hannah in his individual capacity; James A. Hannah, Inc.; H & M Lake Transport, Ltd.; O.L.S. Transport Ltd.; HMC Ship Management, Ltd.; Hannah 5101 Barge, L.L.C.; New Era Hannah Corp.; Hannah Brothers; and Donald C. Hannah Corp. (Doc. 220-6).

prior to September 22, 2008. (Id..).

On January 14, 2009, TransMontaigne sued the Vessels in rem and HMC in personam. (Docs. 1 & 27). Seabulk Towing, Seabulk Services, Whistler, Harrison Brother, and DSI subsequently intervened, each of which has claimed to have maritime liens against the Vessels. (Docs. 37, 38, 53, 82). On March 31, 2009, NCB filed a claim and statement of interest with respect to the Vessels. (Doc. 72).

On April 7, 2009, NCB assigned all of its rights, title, and interest in the "Preferred Fleet Mortgage" to Century through a document entitled "Assignment Agreement" (the "General Assignment"). (Doc. 212-23). The copy of the General Assignment was attached to the motion for summary judgment with the amount of consideration redacted. (See Id., p. 1). This court was later provided with an unredacted version of the General Assignment (Doc. 225), but this court held that the redacted information would remain confidential. (Doc. 226). NCB also contemporaneously executed a document entitled "Assignment of First Fleet Mortgage." (the "Assignment"). (Doc. 212-21). The Assignment provides in relevant part:

> NOW THEREFORE, FOR VALUE RECEIVED, the receipt and sufficiency of which are hereby acknowledged, the Assignor hereby transfers, assigns, sets over and delivers unto the Assignee, its successors and assigns, and the Assignee hereby accepts, 100% of its right, title and interest in the Fleet Mortgage including, without limitation, all moneys and claims for moneys' due and to become due from the Shipowner under and pursuant to the Fleet Mortgage, all of the Assignor's right, title and interest, powers, remedies and privileges under the Fleet Mortgage, and all claims for damages arising out of any breach of the terms of the Fleet Mortgage[.]

(Id., p. 2).

The Assignment was duly recorded with the NVDC. (Doc. 212-1, Joe Seigo Aff., ¶ 9). The court later permitted NCB to substitute Century as its successor in interest by virtue of the Assignment. (Docs. 92 & 117).

A representative of Century testified that HMC has failed to pay as required under the terms of the Preferred Fleet Mortgage, and all conditions precedent have been performed or have occurred to entitle Century to foreclose upon the Preferred Fleet Mortgage.  (Doc. 212-1, Joe Seigo Aff., ¶¶ 8 & 10).  As of October 15, 2009, Century maintains HMC owed it $16,099,310.35, net of payments, accrued interest of $785,198.32, and interest accruing thereafter at $4,079.96 per day.  Century also alleges HMC owes it amounts due for attorney's fees and court costs.  (Id., ¶ 11).

The Vessels were auctioned on August 19, 2009, pursuant to court order.  (Doc. 167). First, Puerto Rico Maritime Consulting, Inc. ("Puerto Rico Maritime") submitted the highest bid of $1,500,000.00 for the Tug WILBUR R. CLARK. (Doc. 197).  On August 19, 2009, Puerto Rico Maritime deposited the $1,500,000.00 with this court.  (Doc. 195, p. 5).  Second, Century was the highest bidder for the Barge HANNAH-7701 with a credit bid of $2,500,000.00 (Doc. 198).

When this court decreed the interlocutory sale of the Vessels on August 19, 2009, this court authorized Century to place a credit bid provided that if Century was the highest bidder at the sale, Century would post a surety bond in the amount of $744,927.75, plus the amount of the United States Marshal's Service's commissions, to secure the claims and attorney fees of the other claimants and the advancements to, and commissions of, the United States Marshal's Service.  (Doc. 167).  As Century was the highest and winning bidder, it posted a bond in the amount of $782,442.75 on August 25, 2009.  (Doc. 199).  The parties agree that because of this bond, "the claims of TransMontaigne and the other Intervenors, as well as the costs, expenses, and commissions of the United States Marshal's Service, are fully secured."  (Doc. 221, p. 5).

6

On November 18, 2009, TransMontaigne, Harrison Brothers, Whistler, Seabulk Towing, Seabulk Services, DSI, and Century filed a joint motion to disburse the proceeds from the sale of the Vessels.  (Doc. 221).  On December 2, 2009, this court granted the parties' joint motion to disburse proceeds from the sale of the Tug WILBUR R. CLARK and ordered that the cash proceeds from the sale in the amount of $1,500,00.00, plus any interest accrued, be disbursed to the parties.  (Doc. 232).  However, in regards to the Barge HANNAH-7701, the parties agreed that the "Clerk of the Court will continue to hold the surety bond posted by Century in the amount of $782,442.75" because "[t]his bond is to secure the claims of TransMontaigne, Harrison Brothers, Whistler, Seabulk [Towing and Services], and DSI and will remain in full force and effect until the issues of priority among the parties have been finally resolved."  (Doc. 221, p. 6).

In its motion for partial summary judgment, Century asks this court to find the following: (1) "that Century possesses a preferred mortgage on the Vessels"; (2) "that HMC is in default of the Preferred Fleet Mortgage"; and (3) "that Century has a preferred mortgage lien against the Vessels."  (Doc. 213, p. 5).  The respondents object to Century's motion asserting that: (1) NCB's assignment of the fleet mortgage to Century is invalid for lack of consideration; (2) Century's lien is precluded by the doctrine of laches; and (3) Century's preferred mortgage lien status has been waived.[6]  (Doc. 220, pp. 7-9).

---

[6] The respondents also assert that Century's lien position should be equitably subordinated because NCB has displayed inequitable conduct which has resulted in prejudice to the other claimants positions. (Doc. 220, p. 4).  As discussed by the respondents, "[i]t is well settled that Admiralty courts will exercise equitable principles, including equitable subordination, to settle disputes regarding lien priority and to subordinate the preferred mortgage holders' lien position to that of competing and otherwise junior lien holders." (Id.)(citations omitted).  However, Century's motion for summary judgment does not ask this court to establish

## LEGAL ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).   "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving

---

the priority positions of the parties' alleged liens, thus the respondents' equitable subordination argument is premature.

party, and resolve all reasonable doubts about the facts in its favor.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999).   "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).   "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."   Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).  "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation and citation omitted).

## B. Whether Century has a preferred mortgage

Century first asks this court to find that Century possesses a preferred mortgage on the

Vessels.  (Doc. 213, p. 5).  A preferred mortgage is "a lien on the mortgaged vessel in the

amount of the outstanding mortgage indebtedness secured by the vessel" that:

> (1) includes the whole of the vessel; (2) is filed in substantial compliance with
> section 31321 of this title; (3)(A) covers a documented vessel; or (B) covers a
> vessel for which an application for documentation is filed that is in substantial
> compliance with the requirements of chapter 121 of this title and the regulations
> proscribed under [it].

46 U.S.C. §§ 31322, 31325(a).

Section 31321 provides, in relevant part, as follows:

> (a)(1) A bill of sale, conveyance, mortgage, assignment, or related instrument,
> whenever made, that includes any part of a documented vessel.., must be filed
> with the Secretary of Transportation to be valid, to the extent the vessel is
> involved, against any person except – (A) the grantor, mortgagor, or assignor; (B)
> the heir or devisee of the grantor, mortgagor, or assignor; and (C) a person having
> actual notice of the sale, conveyance, mortgage, assignment, or related
> instrument. (2) Each bill of sale, conveyance, mortgage, assignment, or related
> instrument that is filed in substantial compliance with this section is valid against
> any person from the time it is filed with the Secretary.
> ...
> (b) To be filed, a bill of sale, conveyance, mortgage, assignment, or related
> instrument must – (1) identify the vessel; (2) state the name and address of each
> party to the instrument; (3) state, if a mortgage, the amount of the direct or
> contingent obligations (in one of more units of account as agreed to by the
> parties) that is or may become secured by the mortgage, excluding interest,
> expenses, and fees; (4) state the interest of the grantor, mortgagor, or assignor in
> the vessel; (5) state the interest sold, conveyed, mortgaged, or assigned; and (6)
> be signed or acknowledged.

46 U.S.C. § 31321

Prior to assigning its rights to Century, NCB possessed a preferred mortgage as defined

by federal law.  First, the Preferred Fleet Mortgage document included "the whole of each of the

Vessels."  (See Doc. 120-20, p. 5).  Second, it identified the Vessels, includes the names and

addresses of the parties, and provides the interests of the respective parties.  (See Id., pp. 1, 4-5, 23).  Third, the document sets forth the obligations that became secured by the mortgage.  (See Id., pp. 5).  Fourth, the Preferred Fleet Mortgage document and all subsequent amendments and supplements were signed, acknowledged, filed and recorded with the NVDC pursuant to 46 U.S.C. § 31321.  (See Id. pp. 1 & 21).

Furthermore, the assignment from NCB to Century also complies with the requirements of federal law.  The Assignment (1) identifies the Vessels; (2) states the names and addresses of the respective parties; (3) states the interest of the assignor in the Vessels and the interest assigned; and (4) was signed, acknowledged, and recorded with the NVDC.  (See Doc. 212-21). Therefore, summary judgment is due to be granted in that Century possesses a preferred mortgage on the Vessels.

The respondents do not challenge the validity of NCB's preferred mortgage, but rather they assert that the assignment from NCB to Century is invalid due to a lack of consideration. (See Doc. 220, pp. 8-9).  The respondents specifically assert that because there are numerous foreclosure sales pending that relate to Century's preferred fleet mortgage, "it is still unknown whether that amount of consideration paid is sufficient to prevent the assignment from being voided."  As a result, the respondents maintain that there is a genuine issue of material fact that remains concerning valid consideration. (Id., p. 9).

The General Assignment provides that "[t]his Assignment shall be governed by and construed in accordance with the substantive laws of the State of Illinois..."  (Doc. 212-23, p. 5). Under Illinois law, a court "will inquire to determine whether a contract is supported by consideration" but "will not inquire into the adequacy of the consideration."  Goodwine State

Bank v. Mullins, 253 Ill.App.3d 980, 1011, 625 N.E.2d 1056 (Ill.App.Ct. 1993).  In other words, "[i]t is not the function of the [court] to review the amount of consideration which passed to decide whether either party made a bad bargain, unless the amount is so grossly inadequate as to shock the conscience of the court."  In sum, "[t]he mere inadequacy of price, in absence of showing of fraud or unconscionable advantage taken, ordinarily is insufficient to justify setting aside the contract." Id.(citations omitted); see Curtis 1000, Inc. v. Suess, 24 F.3d 941, 945 (7th Cir. 1994)("the traditional rule, in Illinois and elsewhere, is that the law does not inquire into the adequacy of the consideration to support a promise, only its existence."); Cincinnati Ins. Co. v. Am. Hardware Mfrs. Ass'n., 387 Ill.App.3d 85, 100-101, 898 N.E.2d 216 (Ill.App.Ct. 2008)("'[a]ny act or promise that benefits one party or disadvantages the other is sufficient consideration to support the formation of a contract.'"(quoting Kalis v. Colgate-Palmolive Co., 337 Ill.App.3d 898, 900, 787 N.E.2d 182 (Ill.App.Ct. 2003)).

Although the copy of the General Assignment was attached to the motion for summary judgment with the amount of consideration redacted, it still provided the following: "NOW, THEREFORE, in consideration, the receipt and sufficiency of which are hereby acknowledged..." (See Doc. 212-23, p. 1).  Also, although this court will not reveal the definite value paid by Century here (See Doc. 226), this court can state that upon review of the unredacted General Assignment document, Century provided a definite monetary value to NCB for the assignment.  (See Doc. 225).  Furthermore, the Assignment document, which was executed at the same time as the General Assignment, provides in relevant part: "NOW THEREFORE, FOR VALUE RECEIVED, the receipt and sufficiency of which are hereby acknowledged, the Assignor hereby transfers, assigns, sets over and delivers unto the Assignee,

12

its successors and assigns, and the Assignee hereby accepts, 100% of its right, title and interest

in the Fleet Mortgage."  (Doc. 212-21, p. 2).   In sum, both the General Assignment and the

Assignment include an admission that they were each executed for value received, in addition to

the General Assignment explicitly setting forth the amount of consideration paid for HMC's

indebtedness.  Therefore, this court finds that there was adequate consideration supporting the

assignment.

### C. Whether HMC is in default of the preferred fleet mortgage

Century next asks this court to find that HMC is in default of the Preferred Fleet

Mortgage.[7]  (Doc. Doc. 213, p. 7).  As established above, NCB and HMC executed the Preferred

Fleet Mortgage on May 5, 2006, and the NCB properly assigned the Preferred Fleet Mortgage to

Century on April 7, 2009.  The Preferred Fleet Mortgage provides that an event of default occurs

if HMC fails to pay any of its obligations as and when they become due and payable.  (Doc. 212-

2, p. 46, ¶ 6.01).  A representative of Century testifies that HMC has failed to pay as required

under the terms of the Preferred Fleet Mortgage, and all conditions precedent have been

performed or have occurred to entitle Century to foreclose upon the Preferred Fleet Mortgage.

(Doc. 212-1, Joe Seigo Aff., ¶¶ 8 & 10).  Neither the respondents nor HMC have disputed this

testimony.  As a result, summary judgment is due to be granted in that HMC is in default of the

Preferred Fleet Mortgage.

### D. Whether Century has a preferred mortgage <u>lien</u> on the vessels

Century lastly asks this court to find that it possesses a preferred mortgage <u>lien</u> on the

---

[7] Under the terms of the original "Preferred Fleet Mortgage" document, the agreement
"shall be governed by and construed in accordance with the substantive laws of the State of
Illinois..." (Doc. 212-2, p. 50, ¶ 7.09).

proceeds of the sale of the Vessels under federal law.  (Doc. 213, p. 5, 11-12).  Under federal

law, "a preferred mortgage is a lien on a mortgaged vessel in the amount of the outstanding

mortgage indebtedness secured by the vessel." 46 U.S.C. § 31325(a).  Upon default of the

preferred mortgage, the mortgagee may "enforce the preferred mortgage lien in a civil action in

rem."  Id. § 31325(b)(1).  When a preferred mortgage covers more than one vessel, when one of

the vessels so covered is to be sold by order of a district court in a civil action in rem, and when

the mortgage does not provide for separate discharge, "the mortgage constitutes a lien on that

vessel in the full amount of the outstanding mortgage indebtedness; and [] an allocation of

mortgage indebtedness for purposes of separate discharge may not be made among the vessel

and other property covered by the mortgage."  Id. § 31322(c)(2).

      This court has already found that Century holds a preferred mortgage on the Vessels.

The preferred mortgage covers more than one vessel and does not provide for a separate

discharge. (See Doc. 212-14).  The Vessels have also been sold pursuant to order of this court in

a civil in rem action.  (See Docs. 167, 197, 198, 232).  Therefore, Century has a preferred

mortgage lien under 46 U.S.C. §31322(c)(2) on the Vessels and the proceeds from the sale of

each vessel.  The respondents do not dispute that Century has a preferred mortgage lien but

instead assert that Century's lien is precluded by the doctrine or laches and/or that NCB has

waived Century's preferred mortgage lien status.  (Doc. 220, pp. 7-8).

### 1. Doctrine of Laches

      The respondents contend that Century's lien is precluded by the doctrine of laches

because NCB failed to pursue its remedies under the preferred mortgage agreement despite

numerous defaults on the part of HMC.  (Doc. 220, p. 7).  In admiralty, "[t]he equitable doctrine

of laches will bar a claim when three elements are present: '(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted.'"  Venus Lines Agency, Inc. v. CVG Int'l Am., Inc., 234 F.3d 1225, 1230 (11th Cir. 2000)(quoting Kason Indus., Inc. v. Component Hardware Group, Inc., 120 F.3d 1199, 1203 (11th Cir. 1997)).

The respondents point to the forbearance agreement entered on September 22, 2008, between HMC and NCB which the respondents allege "shows numerous defaults on the part of its debtor, HMC, which NCB was aware of in December of 2007 or earlier."  (Doc. 220, p. 7). The respondents specifically argue that "NCB is guilty of laches because it chose not to pursue its remedies under the alleged preferred fleet mortgage, even after the numerous instances of default noted above" and rather "entered into a forbearance agreement with HMC", and when TransMontaigne filed their verified complaint, NCB "did nothing for over three months, thereby allowing the vessels to lay idle and deteriorate in value in a declining market." (Doc. 220, p. 7).

In regards to admiralty claims, the Court of Appeals for the Eleventh Circuit maintained that courts "look to the analogous statute of limitations [] as a benchmark in determining whether to apply the doctrine of laches."  Venus, 234 F.3d at 1230.  The former Fifth Circuit[8] stated that "the analogy rule serves primarily to determine where rests the burden of proof."  In other words, "'[w]hen a plaintiff files a claim in admiralty within the analogous statutory period, defendant must show inexcusable delay and resulting prejudice in order to establish a laches defense.'" Mecom v. Levingston Shipbuilding Co., 622 F.2d 1209, 1215 (5th Cir. 1980)(quoting Barrois v.

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Nelda Faye, Inc., 597 F.2d 881, 885 (5th Cir. 1979)); see also Venus, 234 F.3d at 1230;

TAG/ICIB Servs., Inc. v. Pan Am. Grain Co., 215 F.3d 172, 175 (1st Cir. 2000); Azalea Fleet,

Inc. v. Dreyfus Supply & Mach. Corp., 782 F.2d 1455, 1458 (8th Cir. 1986).

      NCB's delay in bringing a claim against the vessels and/or HMC was approximately a

year and four months after the first recorded default of the preferred mortgage and approximately

three months after TransMontaigne filed its verified complaint against HMC and the Vessels.

The limitations period in Illinois's statute of limitations for mortgages is ten years.  735

Ill.Comp.Stat. 5/13-115("[no] person shall commence an action or make a sale to foreclose any

mortgage or deed of trust in the nature of a mortgage, unless within 10 years after the right of

action or right to make such sale accrues.").  Since this is an analogous limitations period, NCB

filed its claim in a timely manner.

      Therefore, the burden shifts and the respondents must demonstrate that NCB's delay in

demanding payment for the outstanding indebtedness of the preferred mortgage was inexcusable

and that the delay was prejudicial to the party against whom the claim is asserted.  See Venus,

234 F.3d at 1230.  The respondents have failed to satisfy this burden.  Upon the defaults that

occurred prior to September 22, 2008, NCB did not immediately foreclose on its mortgage of

HMC, but rather NCB and HMC entered into a forbearance agreement where NCB agreed to not

enforce its right of repayment until December 31, 2008, in exchange for valuable consideration.

(See Doc. 220-5, p. 11).  This agreement allowed HMC to continue as an existing company and

pay off its indebtedness.  Only fourteen days after the December 31, 2008, deadline,

TransMontaigne filed a verified complaint against the Vessels and HMC.  (Doc. 1).  Notice of

this lawsuit was not given until March 9, 10, and 11 and March 16, 17, and 18, 2009, by

publication, and that publication gave any potential claimant till April 1, 2009 to file a verified statement of interest and right.  (Doc. 55 & 55-1).  On March 31, 2009, NCB filed a claim and statement of interest.  (Doc. 72).  Pursuant to the order as published in the newspaper, a claimant had 20 days from the filing of the statement to file its answer.  (Doc. 55).  On April 20, 2009, Century filed its answer and verified complaint.  (Doc. 73).  This court finds nothing in this chain of events that is inexcusable nor is there any evidence that HMC or any other party was unduly prejudiced by the delay.   As a result, this court finds that a reasonable jury could not conclude that Century's lien is precluded by the doctrine of laches.

## 2. Waiver

Relying on First Nat'l Bank of Jefferson Parish v. M/V Lightning Power, 851 F.2d 1543 (5th Cir. 1988), the respondents alternatively contend that since "NCB relied on the credit of the owner, as well [as] other entities, for security" that "NCB has waived its right now [to] claim the benefit of an alleged preferred ship mortgage [holder]."  (Doc. 220, p. 8).  This court does not find this argument persuasive.  First, the above case concerned the potential waiver of a maritime lien for seaman's wages and not a lien created by a preferred mortgage default.  As Century correctly points out, "[p]referred mortgage liens and maritime liens are not treated the same..." (Doc. 228, p. 7 ).  For example, the Ship Mortgage Act deems the preferred mortgage a "lien" on the vessel," 46 U.S.C. § 31325(a), but does not call it a "maritime lien."  Furthermore, the statute distinctively denominates maritime liens and preferred mortgage liens where both are intended. See e.g., 46 U.S.C. § 31326(a); see also United States v. Trident Crusader, 366 F.3d 391, 394 n. 13 (5th Cir. 2004); see Bailey v. United States, 516 U.S. 137, 146, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)(rejecting an interpretation of a criminal statute because "[n]othing here indicates that

Congress, when it provided these two [different] terms, intended that they be understood to be redundant.  We assume that Congress used two different terms because it intended each term to have a particular, nonsuperfluous meaning.").  In light of this distinction, the respondents do not cite, nor can this court find, any cases that extend the waiver rule in First Nat'l Bank to preferred mortgage liens.

Regardless, if this waiver rule does so extend, a reasonable jury could not conclude that the rule applies in the present case.  In First Nat'l Bank, an agent for the vessel owner relied solely upon the earnings of the vessel to fund advances which the agent made for routine maintenance, repairs authorized by the ship owner, groceries and wages for the crew, fuel, and other necessaries.  However, the agent did not rely upon the credit of the vessel owner.  851 F.2d at 1547.  Since the parties stipulated that the agent of the ship owner had paid seaman wages which created a "strong presumption" that the agent acquired a maritime lien, the Fifth Circuit determined that the party opposing such a lien has "the burden of proving that [agent] either relied solely on the credit of the owner or otherwise 'purposefully intended to forego the lien.'" Id. at 1548.  Since the earnings of a vessel are directly related to the vessel itself, the Fifth Circuit concluded "[u]nless the evidence establishes an intent to detach its earnings from the credit of the vessel, a creditor does not forego his right to a lien by looking to the earnings of the vessel."  Id.     In the present case, the respondents failed to provide any evidence nor did they allege that NCB or Century relied solely on the credit of HMC.  Furthermore, the respondents have not shown any evidence that NCB or Century "purposefully intended to forego" their preferred mortgage lien.  Rather, the respondents assert that NCB, and thus Century, waived its preferred mortgage lien because "it elected to look to numerous individual and corporate

18

guarantors and various assignments for security." (Doc. 220, p. 8). However, merely taking other security does not establish a waiver of a lien. See Newport News Shipbuilding and Drydock Co. v. S.S. Independence, 872 F.Supp. 262, 267 (E.D.Va. 1994)("taking of other security has usually not been held to be a waiver of [a maritime] lien."). Without more evidence, this court finds that a reasonable jury could not conclude that NCB's and Century's additional security shows that NCB or Century "purposefully intended to forego" their preferred mortgage lien.

## CONCLUSION

After due consideration of all matters presented and for the reasons set forth herein, it is hereby **ORDERED** that Century's Motion for Partial Summary Judgment (Doc. 212) is **GRANTED**.

**DONE and ORDERED** this 18th day of December, 2009.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE