IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **TRANSMONTAIGNE PRODUCT SERVICES, INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NO. 09-0023-CG-M |
| ) | |
| **M/V WILBUR R. CLARK, and the Barge 7001, <u>in rem</u> and HANNAH MARINE CORPORATION, <u>in personam</u>,** ) ) ) ) | |
| Defendants. ) | |

## ORDER

On January 14, 2009, TransMontaigne Product Services, Inc. ("TransMontaigne") filed a verified complaint in this court seeking the arrest of the vessels M/V WILBUR R. CLARK and Barge HANNAH-7701 (the "Vessels") and asserting a maritime lien for fuel, oil, and supplies furnished to the defendant, Hannah Maritime Corporation ("HMC"), for use on or by the Vessels.[1] (Doc. 1). On January 15, 2009, the United States Marshal's Service for the Southern District of Alabama arrested the Vessels in Mobile, Alabama. (Docs. 7 & 8). On January 23, 2009, Harrison Brothers Dry Dock & Repair Yard, Inc. ("Harrison Brothers") and Whistler Machine Works, Inc. ("Whistler") each filed a complaint in intervention against the Vessels seeking to enforce liens for repairs.[2] (Docs. 9 & 10). On February 27, 2009, Seabulk Towing

---

[1] On February 5, 2009, TransMontaigne filed an amended verified complaint to increase the amount of its maritime lien claim and to correctly identify the barge as HANNAH-7701. (Doc. 27).

[2] On February 13, 2009, Harrison Brothers and Whistler each filed an amended verified complaint in intervention to correctly identify the barge. (Docs. 37 & 38).

Services, Inc. ("Seabulk Services") and Seabulk Towing, Inc. ("Seabulk Towing") filed a verified complaint in intervention to enforce liens for towing and related services. (Doc. 53). On March 12, 2009, HMC filed a verified claim as owner to the Vessels. (Doc. 61). On April 20, 2009, Century Services LP ("Century") filed a verified complaint in intervention asserting a preferred mortgage lien against the Vessels. (Doc. 73). On April 24, 2009, DSI, LLC ("DSI") filed a verified complaint in intervention asserting a maritime lien arising from the furnishing of necessaries to the Vessels. (Doc. 82). On October 29, 2009, Century filed a motion for partial summary judgment. (Doc. 212). On December 18, 2009, this court granted Century's motion and found that Century (1) possesses a preferred mortgage on the Vessels; (2) that HMC was in default of the preferred mortgage on the Vessels; and (3) that Century had a preferred mortgage lien on the Vessels. (Doc. 235). This matter is now before the court on Century's second motion for summary judgment and accompanying brief (Docs. 242 & 243), Whistler, Harrison Brothers, Seabulk Services, Seabulk Towing and DSI's (hereinafter referred to as "the respondents") response (Docs. 251 & 254), and Century's reply. (Doc. 255). For the reasons stated below, the court finds that Century's motion for summary judgment is due to be **GRANTED**.

## FACTS

HMC is a corporation formed under the laws of the State of Illinois and, at all times material hereto, owned the Vessels. (Docs. 1 & 120, Exs. 1 & 3). On May 5, 2006, HMC executed a loan agreement (the "Original Loan Agreement") in favor of National City Bank (f.k.a. National City Bank of the Midwest)(hereinafter referred to as "NCB"). (Doc. 120-5). Under the terms of the Original Loan Agreement, NCB agreed to make available a revolving credit loan to HMC in the aggregate amount of $1,500,000.00 and a term loan in the original

principal amount of $9,250,000.00.  (Id., p. 5).  The Original Loan Agreement was thereafter amended several times, the last of which was on April 2, 2008.  ("Amended Loan Agreement").  (Docs. 120-6, 120-7, 120-8, 120-9, 120-10).  HMC also executed and delivered five promissory notes ("Notes") to NCB between November 2006 and April 2008.  In sum, under the terms of the Notes, HMC agreed to repay a principal amount of $21,614,583.33 plus interest.[3]  (See Docs. 120-13, 120-14, 120-15, 120-16, 120-17).

In the Loan Agreement documents, the parties agreed that HMC "will not cause or permit the aggregate amount of salaries, consulting fees, bonuses, and/or other compensation... paid or committed to be paid by Parent, its Subsidiaries or its Affiliates to Donald C. Hannah during any fiscal year of Parent to exceed $500,000."  (Doc. 251-4, p. 43, ¶ 5.01(o)(iv)).  Furthermore, the parties agreed that HMC

> will not, and it will not cause or permit any Subsidiary to, make any Capital Expenditure or enter into any Capitalized Lease if [HMC] incurs Debt... to finance such Capital Expenditure or Capitalized Lease and the sum of (A) the aggregate amount of all Capital Expenditures (including the Capital Expenditure in question) made by Borrower and all its Subsidiaries on a combined basis during any fiscal year of Borrower plus (B) the aggregate amount of all Capitalized Lease Obligations incurred by Borrower and all of its Subsidiaries on a combined basis during such fiscal year of Borrower would exceed $100,000.00

(Id., p. 43, ¶ 5.01(o)(ii)).

As security for the Amended Loan Agreement and the Notes, HMC provided NCB a

---

[3] The first promissory note, which was executed on November 3, 2006, was for a principal sum of $10,164,583.33. (Doc. 120-13).  The second promissory note, which was executed on May 21, 2007, was for a principal sum of $1,500,000.00.  (Doc. 120-14).  The third promissory note, which was executed on November 3, 2007, was for a principal sum of $3,750,000.00.  (Doc. 120-15).  The fourth promissory note, which was executed in August 2007, was for a principal value of $4,400,000.00. (Doc. 120-16).  The fifth promissory note, which was executed on April 2, 2008, was for a principal value of 1,800,000.00. (Doc. 120-17).

"First Preferred Fleet Mortgage." (Doc. 120-20). This document was recorded with the United States Coast Guard's National Vessel Documentation Center ("NVDC") on May 9, 2006. (Id., p. 1). The original "Preferred Fleet Mortgage" document was thereafter amended and supplemented several times and each amendment and/or supplement was recorded with the NVDC. Each document recites that it amends and/or supplements the "First Preferred Fleet Mortgage" document and all amendments and/or supplements thereto. The "First Preferred Fleet Mortgage" and amendments apply to, and include the whole of, multiple documented vessels, including the Vessels, in full, jointly and severally, as to each of them.[4] (See Docs. 120-21, 120-22, 120-23, 120-24, 120-25, 120-26).

NCB also received several other forms of security (see Doc. 251-1): (1) an assignment of HMC's insurances on the vessels, including any returns of premiums and proceeds (Doc. 220-7); (2) an assignment of all charters and earnings of various HMC vessels (Doc. 220-8); (3) an

---

[4] The original "Preferred Fleet Mortgage" document, dated May 9, 2006, provides the following collateral: Kristin Lee Hannah; HMC-501; HMC-502; HMC-503; HMC-504; HMC-509; HMC-510; HMC-512; HMC-513; Daryl C. Hannah; Hannah 1801; Hannah 1802; Hannah 2902; Hannah 2903; Peggy D. Hannah; Hannah D. Hannah; James A. Hannah; Donald C. Hannah; Hannah-6301; Hannah-7701; and Hannah-3601. (Doc. 120-20, p. 23). The First Amendment, which was dated July 29, 2006, created a revolving credit facility and changed the payment terms but did not add any new collateral. (See Doc. 120-21, pp. 1 & 7). The Second Amendment, which was dated November 3, 2006, again changed the payment terms and lowered some principal but did not add more collateral. (Doc. 120-22, p. 1). The Third Amendment, which was dated August 31, 2007, added one more vessel as collateral: the Rio Bravo. (Doc. 120-23, p. 10). A supplement dated September 13, 2007, also added one more vessel as collateral: the Pacific Victory. (Doc. 120-24, p. 25). A Fourth Amendment, dated April 2, 2008, provided a multiple advance term loan but did not add any collateral to the "Preferred Fleet Mortgage." (Doc. 120-25, p. 3 & 8). Lastly, a supplement and fifth amendment dated September 22, 2008, provided a final list of collateral: Kristen Lee Hannah; HMC-502; HMC-503; HMC-504; HMC-510; Daryl C. Hannah; Hannah 1801; Hannah 1802; Hannah 2902; Peggy D. Hannah; Hannah D. Hannah; James A. Hannah; Hannah-6301; Hannah-7701; Rio Bravo; Pacific Victory; David E.; Hannah 2901; Hannah-3601; and Donald C. Hannah. (Doc. 120-26, p. 8).

assignment of the partnership interest of Donald C. Hannah (Doc. 220-9); and (4) security agreements from several third parties (Doc. 251-1, ¶¶ 5-12). .

On September 22, 2008, NCB and HMC, who was in default of the Amended Loan Agreement at the time, entered into a forbearance agreement where HMC and several guarantors[5] provided consideration for NCB to forebear from taking any action against them or the collateral until December 31, 2008. (Doc. 220-5, p. 1-2, 11). The forbearance agreement specifically pointed to two defaults in December 2007:

> 1. Borrower's failure to provide within 120 days after the end of the fiscal year entered December 31, 2007 (I) the fiscal year end financial statements, (ii) the accountant certification and (iii) the accountant computation of compliance with financial covenants...
>
> 5. Borrower's, Parent's and/or their Affiliates' payment of salary, bonus and other compensation to Donald C. Hannah during fiscal year ending December 31, 2007 in the aggregate amount of $837,228.23 in violation of the $500,000 limitation...
> (Doc. 220-5, pp. 22-23).

The forbearance agreement also listed several other defaults that occurred in the nine months prior to September 22, 2008. (Id..).

On January 14, 2009, TransMontaigne sued the Vessels in rem and HMC in personam. (Docs. 1 & 27). Seabulk Towing, Seabulk Services, Whistler, Harrison Brother, and DSI subsequently intervened, each of which has claimed to have maritime liens against the Vessels. (Docs. 37, 38, 53, 82). On March 31, 2009, NCB filed a claim and statement of interest with respect to the Vessels. (Doc. 72).

---

[5] The following entities are guarantors: Donald C. Hannah in his individual capacity; James A. Hannah, Inc.; H & M Lake Transport, Ltd.; O.L.S. Transport Ltd.; HMC Ship Management, Ltd.; Hannah 5101 Barge, L.L.C.; New Era Hannah Corp.; Hannah Brothers; and Donald C. Hannah Corp. (Doc. 220-6).

On April 7, 2009, NCB assigned all of its rights, title, and interest in the "Preferred Fleet Mortgage" to Century through a document entitled "Assignment Agreement" (the "General Assignment"). (Doc. 212-23). NCB also contemporaneously executed a document entitled "Assignment of First Fleet Mortgage." (the "Assignment"). (Doc. 212-21). The Assignment was duly recorded with the NVDC. (Doc. 212-1, Joe Seigo Aff., ¶ 9). The court later permitted NCB to substitute Century as its successor in interest by virtue of the Assignment. (Docs. 92 & 117).

Also on April 7, 2009, Century sent a letter to Donald C. Hannah, a letter which he signed in his individual capacity, that concerned "a certain secured loan in the original principal amount of U.S. $3,000,000.00 executed and delivered by you personally on or about May 5, 2006 (the 'Sibling Note'), in favor of" NCB "pursuant to a Loan Agreement of the same date." This letter provided the following:

> By this letter, we agree to forego recourse against you on the Sibling Note provided that, and so long as, you cooperate with, and do not impede in any way (including, without limitation, by filing any competing claim, asserting any defense or otherwise), access by Century or its agents or counsel in the foreclosure, repossession and sale or other disposition of assets pledged as collateral by you or [HMC], Hannah Brothers, Hannah 5101 Barge, L.L.C., Donald C. Hannah Corporation..., or any other affiliate of HMC in support of any obligation set forth in either the Sibling Loan Agreement or any Loan document as therein defined or in support of any obligation set forth in or arising under that certain Loan Agreement, dated as of May 5, 2006, between [NCB] and HMC (as amended from time to time...
>
> You further agree to cooperate with Century from time to time in the amendment of the Notes (as defined in the HMC Loan Agreement) to increase the interest rate in each Note to 24% and to amend the Loan Documents accordingly to reflect such amendment in the Notes.
>
> You further agree to cooperate fully in the conclusion of a controlled account agreement among Bank of America, Century, and Hannah Marine Corporation with respect to Bank of America account... in the name of Hannah Marine Corporation, and not to withdraw or cause to be withdrawn any amounts therein except to transfer all such amounts to

> Century for holding or application against obligations.
>
> In the event that, at any time, you breach any of the foregoing obligations to cooperate and not to interfere, this letter agreement shall be deemed null and void ab initio.

(Doc. 251-6).

On April 9, 2009, Donald C. Hannah, on behalf of several corporations, signed a consent to "the full and absolute release" of Donald C. Hannah's personal guaranty of all the obligations contained in the Loan Agreement between HMC and NCB, which at that time had an outstanding principal amount of $14,156,618.11 plus accrued interest. (Doc. 251-7).

A representative of Century testified that HMC has failed to pay as required under the terms of the Preferred Fleet Mortgage, and all conditions precedent have been performed or have occurred to entitle Century to foreclose upon the Preferred Fleet Mortgage. (Doc. 212-1, Joe Seigo Aff., ¶¶ 8 & 10). As of October 15, 2009, Century maintains HMC owed it $16,099,310.35, net of payments, accrued interest of $785,198.32, and interest accruing thereafter at $4,079.96 per day. Century also alleges HMC owes it amounts due for attorney's fees and court costs. (Id., ¶ 11).

The Vessels were auctioned on August 19, 2009, pursuant to court order. (Doc. 167). First, Puerto Rico Maritime Consulting, Inc. ("Puerto Rico Maritime") submitted the highest bid of $1,500,000.00 for the Tug WILBUR R. CLARK. (Doc. 197). On August 19, 2009, Puerto Rico Maritime deposited the $1,500,000.00 with this court. (Doc. 195, p. 5). Second, Century was the highest bidder for the Barge HANNAH-7701 with a credit bid of $2,500,000.00 (Doc. 198).

When this court decreed the interlocutory sale of the Vessels on August 19, 2009, this court authorized Century to place a credit bid provided that if Century was the highest bidder at

the sale, Century would post a surety bond in the amount of $744,927.75, plus the amount of the United States Marshal's Service's commissions, to secure the claims and attorney fees of the other claimants and the advancements to, and commissions of, the United States Marshal's Service. (Doc. 167). As Century was the highest and winning bidder, it posted a bond in the amount of $782,442.75 on August 25, 2009. (Doc. 199). The parties agreed that because of this bond, "the claims of TransMontaigne and the other Intervenors, as well as the costs, expenses, and commissions of the United States Marshal's Service, are fully secured." (Doc. 221, p. 5).

On November 18, 2009, TransMontaigne, Harrison Brothers, Whistler, Seabulk Towing, Seabulk Services, DSI, and Century filed a joint motion to disburse the proceeds from the sale of the Vessels. (Doc. 221). On December 2, 2009, this court granted the parties' joint motion to disburse proceeds from the sale of the Tug WILBUR R. CLARK and ordered that the cash proceeds from the sale in the amount of $1,500,00.00, plus any interest accrued, be disbursed to the parties. (Doc. 232). However, in regards to the Barge HANNAH-7701, the parties agreed that the "Clerk of the Court will continue to hold the surety bond posted by Century in the amount of $782,442.75" because "[t]his bond is to secure the claims of TransMontaigne, Harrison Brothers, Whistler, Seabulk [Towing and Services], and DSI and will remain in full force and effect until the issues of priority among the parties have been finally resolved." (Doc. 221, p. 6).

On October 29, 2009, Century filed a motion for partial summary judgment (Doc. 213), and on December 18, 2009, this court granted Century's motion for partial summary judgment and found that Century possesses a preferred mortgage on the Vessels, that HMC was in default of the Preferred Mortgage, that Century has a preferred mortgage lien against the Vessels, that

8

the doctrine of laches does not preclude Century's preferred mortgage lien, and that Century has not waived its preferred mortgage lien status. (Doc. 235).

On January 22, 2010, Century filed a second motion for summary judgment and asked this court to (1) "find that Century's preferred mortgage lien has priority over all other liens asserted against the Vessels;" and (2) "release Century's $782,442.75 surety bond." (Doc. 243, p. 7). The respondents, on the other hand, assert that (1) Century's lien position should be equitably subordinated"; and (2) "in the event that the court allows Century to maintain its lien priority, that it compel Century to obtain satisfaction of its lien claim from the sale proceeds of the numerous HMC vessels which Century has an interest in, as well as any remaining guarantors, so as to allow the most equitable distribution of assets among the Intervenors..." (Doc. 251, pp. 4 & 12).

## LEGAL ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d

1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a

10

genuine issue for trial." FED. R. CIV. P. 56(e). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation and citation omitted).

**B. Whether Century's preferred mortgage lien has priority over all other liens**

As stated above, the Vessels were auctioned on August 19, 2009, pursuant to court order. (Doc. 167). Century was the highest bidder for the Barge HANNAH-7701 with a credit bid of $2,500,000.00 (Doc. 198). When this court decreed the interlocutory sale of the Vessels on August 19, 2009, this court authorized Century to place a credit bid provided that if Century was the highest bidder at the sale, Century would post a surety bond in the amount of $744,927.75, plus the amount of the United States Marshal's Service's commissions, to secure the claims and attorney fees of the other claimants and the advancements to, and commissions of, the United States Marshal's Service. (Doc. 167). As Century was the highest and winning bidder, it posted a bond in the amount of $782,442.75 on August 25, 2009. (Doc. 199). The parties agreed that the "Clerk of the Court will continue to hold the surety bond posted by Century in the amount of $782,442.75" because "[t]his bond is to secure the claims of TransMontaigne, Harrison Brothers, Whistler, Seabulk [Towing and Services], and DSI and will remain in full force and effect until

the issues of priority among the parties have been finally resolved." (Doc. 221, p. 6).

"When a vessel is sold by order of a district court in a civil action in rem brought to enforce a preferred mortgage lien or a maritime lien, any claim in the vessel existing on the date of sale is terminated..." 46 U.S.C. § 31326(a). However, "[e]ach of the claims terminated under subsection (a) of this section attaches, in the same amount and in accordance with their priorities to the proceeds of the sale, except that – (1) the preferred mortgage lien... has priority over all claims against the vessel (except for expenses and fees allowed by the court, costs imposed by the court, and preferred maritime liens)...." Id. § 31326(b)(1). A "preferred maritime lien" means a "maritime lien on a vessel – (A) arising before a preferred mortgage was filed under section 31321 of this title; (B) for damage arising out of maritime tort; (C) for wages of a stevedore when employed directly by a person listed in section 31341 of this title; (D) for wages of the crew of the vessel; (E) for general average; or (F) for salvage, including contract salvage..." Id. § 31301(5). A "preferred mortgage" means a "mortgage, whenever made, that – (1) includes the whole of the vessel; (2) is filed in substantial compliance with section 31321 of this title; [and] (3)(A) covers a documented vessel..." Id. § 31301(6); § 31322(a). When a preferred mortgage covers more than one vessel, when one of the vessels so covered is to be sold by order of a district court in a civil action in rem, and when the mortgage does not provide for separate discharge, "the mortgage constitutes a lien on that vessel in the full amount of the outstanding mortgage indebtedness; and [] an allocation of mortgage indebtedness for purposes of separate discharge may not be made among the vessel and other property covered by the mortgage." Id. § 31322(c)(2).

This court previously found that "Century has a preferred mortgage lien under 46 U.S.C.

12

§ 31322(c)(2) on the Vessels and the proceeds from the sale of each vessel." (Doc. 235, p. 14). The intervening claimants allege liens for "necessaries", i.e., claims for repairs, supplies, and towage, and not for damage arising from a maritime tort, general average, salvage or wages of the crew or stevedore.[6] The intervening claimants' liens did not arise before May 9, 2006, the date that NCB filed the Preferred Mortgage with the NVDC.[7] (See Doc. 120-20, p. 1). Therefore, as a matter of law, Century's preferred mortgage lien has priority over all the intervening claimants' liens in regards to the $782,442.75 surety bond that is currently being held by the Clerk of Court.

The respondents, however, ask this court, under the doctrine of equitable subordination, to make Century's superior ranking lien subordinate to the respondents' lesser liens based upon the inequitable conduct of Century.[8] (Doc. 251, p. 4). Under the doctrine of equitable

---

[6] On January 14, 2009, TransMontaigne filed a verified complaint in this court seeking the arrest of the Vessels and asserting a maritime lien for fuel, oil, and supplies furnished to the defendant HMC for use on or by the Vessels. (Doc. 1). On January 23, 2009, Harrison Brothers and Whistler each filed a complaint in intervention against the Vessels seeking to enforce liens for repairs. (Docs. 9 & 10). On February 27, 2009, Seabulk Services and Seabulk Towing filed a verified complaint in intervention to enforce liens for towing and related services. (Doc. 53). On April 24, 2009, DSI filed a verified complaint in intervention asserting a maritime lien arising from the furnishing of necessaries to the Vessels. (Doc. 82).

[7] Whistler alleges that its lien arose from services it rendered to the Tug WILBUR R. CLARK in May 2008 to rebuild a lift boom on said vessel. (Doc. 37, ¶ 4). Harrison Brothers' lien allegedly arose from repairing the Tug WILBUR R. CLARK between October-November 2007. (Doc. 38, ¶ 4). Seabulk Towing claims that its lien arose from towing services rendered between September and December 2008 while Seabulk Services' lien allegedly arose from the provision of towing services to the Vessels between October 2008 and January 2009. (Doc. 53, ¶¶ 6 & 7). DSI alleges that its lien arose for labor and contracting services rendered to the Vessels between October and November 2007. (Doc. 82, ¶ 4).

[8] "While equitable subordination is a concept which has more frequently been used in bankruptcy cases, it has also been applied in admiralty cases." United States v. Pride of Tex., 964 F.Supp. 986, 990 (E.D.Va. 1994).

subordination, "three conditions are necessary to justify the equitable subordination of an otherwise valid lien:"

> (I) The claimant must have engaged in some type of inequitable conduct.
>
> (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.
>
> (iii) Equitable subordination of the claim must not be inconsistent with [statutory provisions].
>
> Custom Fuel Servs., Inc. v. Lombas Indus., Inc., 805 F.2d 561, 566 (5th Cir. 1986)(alliteration in original)(citation omitted).

"The proponent of equitable subordination has the burden of proving each element." In re Racing Servs., Inc., 386 B.R. 751, 755 (8th Cir. 2008).

In regards to the first factor, the respondents' burden as to showing "inequitable conduct" depends on whether Century/NCB is a fiduciary of the debtor or an arms' length creditor. See Boyd v. Sachs (In re Auto Specialities Mfg. Co.), 153 B.R. 457, 478 (Bankr.W.D.Mich. 1993). "Where there is a fiduciary relationship, a high standard of conduct is imposed..."[9] Id. While traditionally fiduciaries who are held to this standard are the "usual variety of officers, directors, attorney's and the like", Century, a creditor, "may become a fiduciary of [HMC]... if it uses its

---

[9] As the Supreme Court stated:

> He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment.

Pepper v. Litton, 308 U.S. 295, 311, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939)(footnotes omitted).

leverage to take over operation of the company and thus step into the shoes of the traditional corporate fiduciaries." Id.. The respondents did not argue, nor could a reasonable jury conclude from the evidence provided, that NCB or Century was a fiduciary or insider of HMC. Therefore, since NCB/Century operated with HMC as an arms' length creditor, Century's preferred mortgage lien "will not be equitably subordinated unless egregious conduct on behalf of the creditor can be proven with particularity." In re Auto Specialties Mfg. Co., 153 B.R. at 478 (citing Zimmerman v. Cent. Penn. Nat. Bank (In re Ludwig Honold Mfg. Co.), 46 B.R. 125, 128 (Bankr.E.D.Pa. 1985)). "Equitable subordination in such cases is 'an extraordinary remedy.'" Id.(citation omitted).

There are "'[t]hree types of inequitable conduct'" that are "'sufficient to warrant subordination [of a lien]: (1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego.'" Dresdner Bank AG v. M/V OLYMPIA VOYAGER, 463 F.3d 1233, 1238 (11th Cir. 2006)(quoting Custom Fuel Servs., Inc., 805 F.2d at 566 (internal quotation marks omitted)). The respondents ask this court to equitably subordinate Century's preferred mortgage lien position because NCB so "completely control[ed] HMC" that it became "its alter ego." (Doc. 251, p. 5). In support of this argument, the respondents assert that NCB/Century acted inequitably because (1) "NCB so completely dominated and controlled... HMC by a formidable array of every security device known to a lender"; (2) "NCB controlled the salaries that HMC could pay its people"; (3) "NCB plac[ed] capital spending limits upon HMC"; and (4) "as it saw fit, NCB released and/or added

to the schedule of vessels claimed to be covered by the preferred ship mortgage."[10] (Id.).

This court does not find the respondents' arguments persuasive and finds that a reasonable jury could not conclude that NCB or Century used HMC as a mere instrumentality or alter ego. First, the fact that NCB secured HMC's repayment with a mortgage, assignments, security agreements, and personal guarantees does not warrant subordination of Century's preferred mortgage lien. See Union Bank of Georgetown v. Laird, 15 U.S. 390, 394 (1817)("A creditor may lawfully take and hold several securities for the same debt... and he cannot be compellable to yield up either until his debt is paid."). Second, although the respondents maintain that NCB controlled the salaries HMC paid all its employees (see Doc. 251, p. 5), the provision upon which the respondents rely merely limits the salary paid to Donald C. Hannah,

---

[10] The respondents also argue that "NCB's inequitable conduct is also revealed by the fact that it allowed [the respondents] to provide services to the Vessels, even though it was aware, or should have been aware, that HMC was under such financial strain that it could not pay for the various services being rendered to the Vessels." They point specifically to the Forbearance Agreement between NCB and HMC which indicates several defaults by HMC as early as December 2007 and the fact that NCB allowed the Vessels to continue to operate and receive services rather than foreclosing on the Vessels. (Doc. 251, p. 6).

While it is true that upon the defaults that occurred prior to September 22, 2008, the date of the Forbearance Agreement, NCB did not immediately foreclose on its mortgage of HMC, but rather NCB and HMC entered into a forbearance agreement where NCB agreed to not enforce its right of repayment until December 31, 2008, in exchange for valuable consideration. (See Doc. 220-5, p. 11). This agreement, however, was not inequitable, but rather it allowed HMC to continue as an existing company and properly pay off its indebtedness.

Furthermore, only fourteen days after the December 31, 2008, deadline, TransMontaigne filed a verified complaint against the Vessels and HMC. (Doc. 1). Notice of this lawsuit was not given until March 9, 10, and 11, and March 16, 17, and 18, 2009, by publication, and that publication gave any potential claimant till April 1, 2009 to file a verified statement of interest and right. (Doc. 55 & 55-1). On March 31, 2009, NCB filed a claim and statement of interest. (Doc. 72). Pursuant to the order as published in the newspaper, a claimant had 20 days from the filing of the statement to file its answer. (Doc. 55). On April 20, 2009, Century filed its answer and verified complaint. (Doc. 73). This court finds nothing in this chain of events that is inequitable nor is there any evidence that HMC or any other party was unduly harmed by the delay.

who was the Chief Executive Officer of HMC.  (See Doc. 251-4, p. 43, ¶ 5.01(o)(iv)(the parties agreed that HMC "will not cause or permit the aggregate amount of salaries, consulting fees, bonuses, and/or other compensation... paid or committed to be paid by Parent, its Subsidiaries or its Affiliates to Donald C. Hannah during any fiscal year of Parent to exceed $500,000.") & p. 53).  Third, even though the respondents assert that the parties' agreement to limit the capital expenditures of HMC was evidence of NCB's domination over HMC, this court disagrees.  The Amended Loan Agreement only places limits on capital expenditures if HMC "incurs Debt... to finance such Capital Expenditure..." (Doc. 251-4, p. 43, ¶ 5.01(o)(ii)).  This limit on capital expenditures protects not only NCB but also other creditors including the respondents.  Fourth, despite the fact that the respondents argue that NCB unilaterally released and added collateral to secure the loan agreement (see Doc. 251, p. 5), each amendment to the Original Loan Agreement and each amendment to the First Preferred Fleet Mortgage were arms length transactions between NCB and HMC in which NCB gave additional consideration and HMC agreed to release, add or exchange collateral.  (See Doc. 120-20 – 120-26).

 In light of the foregoing, this court finds that a reasonable jury could not conclude from the evidence provided that NCB/Century was treating HMC "as a mere instrumentality or alter ego."  Therefore, the respondents have failed to satisfy their burden in showing that NCB/Century has "engaged in some type of inequitable conduct."[11]  Since the respondents have

---

[11] The respondents also argue that

> "[a]nother of Century's actions which has caused harm to the Intervenors' ability to recover on their maritime liens and which further demonstrates Century's domination/control over HMC was Century's unilateral release of Mr. Donald C. Hannah's personal guaranty and of his controlled corporate guarantys, guarantys [sic] which Century could and should have otherwise looked to for satisfaction of

failed to prove the first condition justifying the equitable subordination of Century's otherwise valid lien, this court holds that Century's preferred mortgage lien has priority over all other liens asserted against the Vessels.

### C. Whether this court should release Century's $782,442.75 surety bond

Upon a finding that it has priority over all other liens asserted against the Vessels, Century asks this court to "release Century's $782,442.75 surety bond." (Doc. 243, p. 7). However, the respondents ask "that this Court invoke the equitable doctrine of marshaling of assets" and only allow the release of the surety bond "after Century is made whole by its recovery from the proceeds of the vessel sales in this case and in Northern District of Illinois and the Northern District of New York and other jurisdictions..." (Doc. 251, p. 10-11).

Marshaling is an equitable doctrine which "rests upon the principle that a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." Sowell v. Federal Reserve Bank, 268 U.S. 449, 457, 45 S.Ct. 528, 530, 69 L.Ed. 1041 (1925). The purpose of the doctrine is to "prevent

---

> its own lien, thereby leaving the Vessels' sale proceeds/surety bond herein for satisfaction of Interventors' claims.

(Doc. 251, p. 6).

While this conduct may have arguably "resulted in injury to the creditors of the bankrupt," this conduct does not demonstrate proof that HMC was a "mere instrumentality" of NCB. Any agreement between Donald C. Hannah, a third party, and Century regarding personal guarantees is not evidence of an "alter ego" relationship between NCB/Century and HMC. Century was within its contractual rights to forgo enforcing these personal guarantees as it was not bound by the Preferred Fleet Mortgage to seek recovery from any of the personal guarantors. (See Doc. 120-22, ¶ 3.3). As a result, this court finds that a reasonable jury could not conclude that HMC was a "mere instrumentality" of NCB/Century because of Century's agreement with a third party to forego personal guarantees.

the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." Meyer v. United States, 375 U.S. 233, 237, 84 S.Ct. 318, 321, 11 L.Ed.2d 293 (1963).

This court finds that marshaling HMC's assets in the manner the respondents propose is not appropriate in this case.  First, the Supreme Court provided that "[a] court of equity will not entertain the question of marshalling [sic] assets, unless the funds are within the jurisdiction and control of the court." Lewis v. United States, 92 U.S. 618, 623, 23 L.Ed. 513 (1875).  The "funds" that the respondents want Century to exhaust prior to retaining the surety bond held by this court are located in "the Northern District of Illinois and the Northern District of New York and other jurisdictions..." (Soc. 251, p. 11).  Second, preventing Century from receiving the surety bond in this court would force Century to satisfy its debt in other districts which would prejudice the interests of any junior lienholders of other vessels in other districts.  A court may require a senior creditor to look first to property which cannot be reached by the junior creditor, but only if the senior creditor or third parties are not prejudiced.  Id.; see John W. Stone Oil Distributor, Inc. v. M/V Mr. W. Bruce, 752 F.2d 184, 187 (5th Cir. 1985)("A junior lienholder... may invoke the marshalling [sic] of assets doctrine only if it will not operate to the detriment of other creditors."(citation omitted)).  Although the record does not contain the names of the junior lienholders of these other vessels nor the nature or amount of their claims against those other vessels, this court will not use its discretion and allow marshaling HMC's assets in a manner that may be prejudicial to those other junior lienholders.

## CONCLUSION

After due consideration of all matters presented and for the reasons set forth herein, it is

hereby **ORDERED** that Century's Motion for Summary Judgment (Doc. 242) is **GRANTED** and the clerk of court is **ORDERED** to disburse the $ 782,442.75 surety bond to Century Services LP.

It is also **ORDERED** that the parties advise this court, no later than April 12, 2010, what issues that are pending still need to be resolved.

**DONE and ORDERED** this 29th day of March, 2010.

/s/ Callie V. S. Granade
UNITED STATES DISTRICT JUDGE